UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GEORGE M.,[1]

      **Plaintiff,**

                                **Case No. 2:24-cv-9573**

      v.                         **Magistrate Judge Norah McCann King**

**FRANK BISIGNANO,[2]**
**Commissioner of Social Security,**

      **Defendant.**

**OPINION AND ORDER**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff George M. for Child Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 402 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application. After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Frank Bisignano, the current Commissioner of Social Security, is substituted as Defendant in his official capacity. *See* Fed. R. Civ. P. 25(d).

1

## I.    PROCEDURAL HISTORY

On December 23, 2020, Plaintiff filed an application for child's insurance benefits,[3] alleging that he had been disabled since November 1, 2005. R. 96–97, 331–34.[4] The application was denied initially and upon reconsideration. R. 103–06, 110–14. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). R. 108–09. ALJ David Suna held a hearing on June 14, 2023, at which Plaintiff, who was represented by counsel, testified, as did a medical expert and Plaintiff's mother. R. 36–89.[5] In a decision dated December 22, 2023, the ALJ found that Plaintiff had not been under a disability at any time prior to August 19, 2007, the date on which Plaintiff attained the age of 22. R. 14–28. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on August 6, 2024.

---

[3] Child's insurance benefits are payable to a child "of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual" under certain circumstances. 42 U.S.C. § 402(d)(1)(B). The applicable regulation further explains that an applicant is entitled to such child's benefits if:

> (1) You are the insured person's child, based upon a relationship described in §§ 404.355 through 404.359;
> (2) You are dependent on the insured, as defined in §§ 404.360 through 404.365;
> (3) You apply;
> (4) You are unmarried; and
> (5) You are under age 18; you are 18 years old or older and have a disability that began before you became 22 years old; or you are 18 years or older and qualify for benefits as a full-time student as described in § 404.367.

20 C.F.R. § 404.350(a). In the present case, although he was an adult at the time he filed his application (he was 20 years old on his alleged disability onset date), R. 19, 90, 98, Plaintiff sought child's insurance benefits based on the earnings record of his mother, an insured person who was entitled to benefits. R. 6, 14, 17, 96–97, 392.

[4] The relevant period for this claim is November 1, 2005, Plaintiff's alleged disability onset date, through August 19, 2007, the date on which Plaintiff attained the age of 22. R. 17 (noting further that Plaintiff had previously received a favorable determination in connection with a prior claim for supplemental security income benefits with an established disability onset date of November 1, 2015).

[5] A vocational expert appeared at the hearing but did not testify. *Id*.

2

R. 1–6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On February

7, 2025, Plaintiff consented to disposition of the matter by a United States Magistrate Judge

pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No.

14.[6] On February 28, 2025, the case was reassigned to the undersigned. ECF No. 15. The matter

is ripe for disposition.

## II.     LEGAL STANDARD

### A.     Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations. And whatever the meaning of substantial in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial evidence, this
> Court has said, is more than a mere scintilla. It means – and means only – such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations and quotation marks omitted);

*see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations

omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and

quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091,

---

[6]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see*

4

*K.K.*, 2018 WL 1509091, at *4.  The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

### B.  Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4); *see also Bruner v. Astrue*, No. 4:11-CV-1359, 2012 WL 5398635, at *4 (M.D. Pa. Nov. 5, 2012) ("In determining whether an applicant for adult child disability benefits and SSI benefits satisfies the definition of disability, the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a)(4) is used."). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe

impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 20 years old on his alleged disability onset date. R. 19, 90, 98. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between November 1, 2005, his alleged disability onset date, and August 19, 2007, the date on which Plaintiff attained the age of 22. R. 17, 19.

At step two, the ALJ found that, prior to attaining age 22, Plaintiff suffered from the medically determinable impairment of psychosis not otherwise specified ("NOS"), but that Plaintiff did not suffer a severe impairment or combination of impairments. R. 19–28. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time prior to August 19, 2007, the date on which Plaintiff attained the age of 22. R. 28.

Plaintiff argues that the ALJ failed to help develop his case, *i.e.*, failed to obtain evidence; he asks that the decision of the Commissioner be reversed and remanded for further proceedings. *Plaintiff's Brief*, ECF No. 10; *Plaintiff's Reply Brief*, ECF No. 13. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief*, ECF No. 12.

## IV.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    Emergency Department Visit in June 2007

The ALJ detailed an emergency department visit in June 2007:

Turning back to the June 5, 2007 emergency department visit, the emergency department triage note indicated that he was exhibiting "bizarre" behavior and threatening his parents, but he was also exhibiting intact alertness and orientation upon presentation (12F/2 [R. 628]). During the escort from triage to the emergency department, they noted that he exhibited controlled but tense behavior, and he was cooperative with the physical examination (12F/9 [R. 635]). The initial psychiatric evaluation on June 5, 2007 contains the claimant's report that he had "ingested alcohol," then drove to his church in only his underwear on June 4, 2007, and entered the altar (12F/22-27 [R. 648–53]). His mother reported that at the time that he was exhibiting compulsive behavior for three months consisting of cleaning and washing, as well as made verbal threats if his demands were not met (12F/22 [R. 648]). The mental status examination was remarkable for evasive and guarded attitude, hesitant speech that was normal in rate and tone, depressed mood, constricted affect, and unspecified impairments in short-term and long-term memory, insight, and judgment (12F/23-24 [R. 649–50]). However, he also exhibited neat grooming, appropriate eye contact, calm psychomotor activity, logical, lucid, and coherent thought process, intact orientation, and denials of suicidal or homicidal ideation (Id.). At that time, he reported being a second-year

8

student at Fairleigh Dickinson University (12F/26 [R. 652]). The psychiatric evaluation on June 6, 2007 revealed anxious mood, guarded affect, circumstantial thought process, no suicidal or homicidal ideation, no bizarre delusions, "some" paranoia regarding his health, poor insight, and denials of perceptual deficits (12F/36-37 [R. 662–63]). Although this psychiatrist recommended inpatient hospitalization, the claimant refused, and as he was "in no immediate danger to self or others," the psychiatrist noted that he did not meet the criteria for involuntary admission (Id.). At discharge, he received a diagnosis of psychosis NOS, with a recommendation to follow up with an outpatient mental health specialist (12F/37 [R. 663]).

R. 22.

### B.    Igor Gefter, M.D.

On April 18, 2016, Igor Gefter, M.D., Plaintiff's treating psychiatrist, authored the following letter addressed "TO: WHOM IT MAY CONCERN":

DEAR SIR/MADAM,

PLEASE BE INFORMED THAT MR. GEORGE S. M[.] HAS BEEN UNDER MY CARE FROM 02/05/16; AT DIFFERENT TIMES HE WAS DIAGNOSED WITH RESIDUAL SCHIZOPHRENIA, SCHIZOAFFECTIVE DISORDER BIPOLAR TYPE; DELUSIONAL DISORDER, CHRONIC.

PATIENT IS SUFFERING FROM CHRONIC, INTRACTABLE DELUSIONS OF GRANDEUR; EXPERIENCING AUDITORY HALLUCINATIONS; ENGAGING IN ABSOLUTELY USELESS, FUTILE, BASED ON HIS DELUSIONS ACTIVTIES; PRACTICING "BARTER ECONOMY" WITH HIS PARENTS.

HE IS ABSOLUTELY INCAPACITATED; UNABLE TO WORK; HAS NEVER BEEN ABLE TO MAINTAIN ANY JOB; CURRENTLY (FOR THE LAST SEVERAL YEARS) ENGAGED IN CREATION OF "INTERMENT BUSINESS" BASED ON SEVERAL IDEAS INCLUDING: "FOR A JUST WORLD I WOULD SUPPOSE LEADERSHIP, WHETHER THE DAY OR AUTHORITY I KNOW THIS THAT ALL BY ECONOMICS THAT SATISFACTION IS HENCE A HATE OR LOVE."ABOUT 320K FOR A AN ENTRY OF MERCHANTS FEATURED BY THE LOWEST PRICES!" – THESE ARE DIRECT QUOTES FROM THE PATIENT AS AN EXAMPLE OF HIS THINKING.

UNFORTUNATELY, PATIENT IS UNABLE TO RECOGNIZE HIS SYMPTOMS AND DOES NOT ACKNOWLEDGE PRESENCE OF ILLNESS; HE IS ABSOLUTELY REFUSING TO APPLY FOR SOCIAL SECURITY

DISABILITY OR ANY GOVERNMENTAL SUPPORT (WHICH IS GREATER THE GOVERNMENT – TERRIBLE TO THIS PERSON WHO IS TOTALLY UNABLE TO TAKE CARE OF HIMSELF) – AND HE IS IN CLEAR NEED OF SUCH SUPPORT AS UNFORTUNATELY, AFTER SO MANY YEARS OF ILLNESS HIS PROGNOSIS IS GRAVE.

R. 509 ("April 2016 opinion"), 669 (duplicate), 701 (duplicate).

In a letter dated June 19, 2021, Dr. Geter opined that Plaintiff's symptoms had begun in

December 2005:

LETTER IN SUPPORT OF THE DISABILITY REPORT APPEAL

Dear Sir/Madam,

Please be advised that 1 have been a treating psychiatrist for this patient since April 2009. My first encounter was the patient had been on Acute Psychiatric Ward of the Ramapo Ridge Psychiatric Hospital with presentation of acute psychosis, delusions and paranoia have been pervasive in the picture of the admission.

Patient was treated without much of success and was discharged to his parents.

I subsequently continue treating this patient at the several locations, including current location at the Wayne Behavioral LLC.

I "inherited" this patient from a colleague of mine Dr. MANAL SOUS, who previously treated this patient for a number of years.

History of his severe illness goes back to the time of him being 20 years old when he first developed disorganized behavior bizarre paranoid thoughts and intense issues with his cognitive functioning . Ever since l know this client and according to the information available to me from his previously engaged providers, he showed signs of disconnection from the objective reality of surrounding world. He has been living and continuously existed in his own universe of grandiose delusions, where he is a successful, profoundly reach and omnipotent human with a superb abilities. On multiple occasions he would demonstrate his "superiority" to me by bringing his laptop in the office and showing me the page of his "Business". In reality that was nothing else but a delusion of grandiose content. He paid thousands of dollars to some unscrupulous on-line company to create just one lousy page with some slogans and the name that did not make sense to anybody with half a brain .. . He had a feeling that he was selling something on the Internet when in reality he was buying stacks of absolutely useless junk, which would accumulate in the family garage ... Despite all my efforts to help his young man, I have an absolute certainty that me personally and contemporary science simply failed him. Not only he did not improve at all, but his situation and condition as well as his behavior

10

deteriorated. His current presentation is a presentation of a person [end of text]

The above description is absolutely no [sic] an exaggeration, but probably would be a minimization of currently observed symptoms.

*As far as I know, his symptoms started and possibly was somehow precipitated or became more apparent around December 2005 after he had a car accident and was diagnosed by Dr. MOIR A. DAWOUD with "Depression",* after he had a Right Hip Fracture, secondary to MVA and was referred to psychiatric care. Unfortunately he himself would never recognize presence of illness, experiencing severe ANOSOGNOSIA [unaware of own mental health condition]. As an example - it took me several years to convince him that he must apply for the Social Security Disability, when he firmly believed that he is a superior, on the level of the genius businessman, software computer programmer, who has been dramatically successful when in reality this is a complete Delusional System.

As almost every known to me person with Chronic Schizophrenia, patient on more than one occasion would discontinue taking his medicine and would develop severe behavioral disturbance frequently resulted in involvement of the local Police Department officers.

I wrote multiple letters on his behalf to different Agencies in the past and persistently try to help him. I am absolutely certain and testify in this letter that his illness started early in life and that he by definition is a "picture perfect" of a person with classic onset of Schizophrenia (time wise/age wise), which effectively removed him from even the slightest possibility of becoming a successful, contributing member of our Society. If anybody deserves Social Security Disability because of the biological illness affecting them - this man fits all the parameters and requisites.

I am asking you, with all humility, to reconsider decision of denying him Social Security benefits that he deserves and more importantly needs: his parents are elderly and will not be able to continuously support him. Left on his own accord without much of any skills to survive, without ability to pay for group home, nutrition and minimal other expenses this man will be in grave danger.

R. 625–26 ("June 2021 opinion") (emphasis added).

In a letter dated February 2, 2023, Dr. Gefter again opined, *inter alia*, that Plaintiff's

condition began around December 2005:

To Whom It May Concern:

Please be informed that MR. M[.] has been under my care from 02/17/2014; initially has been seen in the office in Fairlawn that subsequently was closed and

11

currently he is seen by me at Wayne Behavioral. He has been diagnosed with several different severe emotional conditions including: Residual schizophrenia, F20.5 (ICD-10) (Active) / Other schizophrenia, F20.89 (ICD-10) (Active) & Major Depressive Disorder, Recurrent Severe With Psychotic Features, F33.2 (ICD-10) (Active); he is tremendously resilient and resistant to care and his condition is static with intense progressive deteriorations time to time which are absolutely unpredictable. I "inherited" this patient from Dr. DAWOUD. His desperate parents reached out to me in hope that I will be able to convince this young man to be consistent with his treatment. *His symptoms started around December of 2005 and they corresponded to the car accident when the first time engagement with his psychiatrist/previous provider happen. There is absolutely no doubt that his symptoms reached profound levels way before 2007 and that was quite clear to more than a reasonable degree of medical certainty at the time.* She [sic] still refused treatment and his treatment was very sporadic. The basis to that opinion is my multiple conversation with patient's parents; historical facts about schizophrenia also correspond to the age of the onset of illness for this gentleman; my examination of patient's which are in numerous as well as my training and work on acute psychiatric facilities for at least 38 years old point to that conclusion. During my lifetime I treated possibly 4-5 thousand people with such conditions including my work at the largest psychiatric facility with the largest population of chronic patient with schizophrenia-Bronx psychiatric Center in New York.

*It is absolutely unquestionable to once again more than a reasonable degree of medical certainty that his symptoms are indicating presence of chronic delusions, ongoing auditory hallucinations; disorganized thinking and all of these have been present since 2005 and only getting worse as time progresses.* My engagement was [sic] the patient are unfortunately not as frequent as I would suggest and desire mostly because patient simply refuses to see a physician. During the years of my engagement with this patient we tried multitude of most effective currently available antipsychotic medications and he failed trial on most of them. I did not see much of improvement of his symptoms at all and if anything-I am observing slow deterioration as it is customary and usually observed with patient suffering from severe thought disorder. This young man would have been dead by now if not the drastic efforts of his elderly parents, who also raised his child.

1 want to be absolutely clear in this letter that I am certain, absolutely and fully convinced to a reasonable degree of medical certainty that the onset of illness prevented this young man from ever being able to be productive member of society, works for wages and survive without help of others who are currently available but will not be available forever in his future life. When such help will not be available this man will not be able to survive on his own; he is unable to make any living; it took him more than a decade to get some strange degree from some strange University out of their [sic] and he firmly believe-in his delusion-that he is one of the most talented and prolific money makers of the universe when in reality he is spending time doing nothing, smoking his lungs and brain away and creating tremendous, sometimes impossible pressure within the household. I do not know a

single parent who has been able to tolerate such pressure except his parents and I have seen a lot of people with such conditions!

This is my desperately [sic] to the office of Social Security to recognize that this man has been suffering and will continuously suffer from profound, dramatically disabling, extremely if not excruciatingly difficult for people who are helping him condition and that he would never be able to become a productive member of society and what is more important that *it is absolutely no doubts* [sic] *more than a reasonable degree of medical certainty that he has been disabled from childhood.*

R. 697–98 ("February 2023 opinion") (emphasis added).

### C.    Ashok Khushalani, M.D.

Ashok Khushalani, M.D., a medical expert, testified at the June 2023 administrative hearing that, even if Plaintiff had symptoms during the period 2003 to 2007, he could not say that any impairment was severe during that time:

A. Judge, in the time period that you are mentioning I don't see any record outlining any mental impairments. There are some records in that time period, but they don't relate to that.

Q [by ALJ]. . . . Is it reasonable to say that after 2007 there are some mental health related impairments that you have identified in the record?

A. Yes.

Q. Okay.

A .I can do so, judge.

Q. All right. Could you identify those impairments for me?

A. Initially, he was characterized as having schizoaffective disorder at 10F. But subsequently he has been identified as having schizophrenia.

Q. And just so I know, when approximately were those conditions diagnosed?

A. 10F. The initial diagnosis was in April 2009 at the Ramapo Ridge Psychiatric Hospital, Exhibit 10F.

Q. Okay. Any other mental health related conditions I should be aware of, other than schizoaffective disorder and schizophrenia?

A. No. That primarily is the disorder.

Q. All right. And so, let me ask you this. Is the type of condition that may have been prevalent back in the years 2003 to 2007?

A. It is possible. Generally, you know, these conditions are present in late adolescence to early adulthood and so, it is certainly possible.

Q. All right. I think I know where -- well, let me just ask the question instead of assuming things. Would it be reasonable in your medical opinion that Mr. M[.] would have had either schizoaffective disorder and/or schizophrenia back in the time frame we are talking about here, meaning 2003 to 2007?

A. He may have had some symptomology. It is difficult to say. You know, he could have had some symptomatology that was not severe and presented mild symptoms or he may not have. It is difficult for me to say that he would have. Remember, he was diagnosed in 2009. It is almost like a two or a three-year gap. And so, it is possibly certainly. I do not know for sure. There is no record to indicate that.

Q. Okay. And so, is it fair to say then that from -- during the time period that I am reviewing, in your medical opinion, you are not comfortable identifying a severe impairment during that time. Is that fair or unfair?

A. No. That is absolutely accurate.

R. 46–48.

In response to Plaintiff's counsel, Dr. Khushalani testified to the criteria used for

diagnosing schizophrenia and identified the typical age of onset of the condition in men:

Q [by Counsel] Do your criteria -- what do you look for in determining that a patient has schizophrenia?

A What I am looking for? I mean, there are several criteria. Basically, the main issue with schizophrenia is that it is known as what as a prog disorder. It may include symptoms of somebody having ideations, delusions. Then, you are also looking for auditory disorder, hallucinations, mood fluctuations, suicidal ideation, neglect of personal hygiene, neglect of social relationships, and those are the hallmarks of schizophrenia.

Q . . . Is there an average onset in males for schizophrenia?

A Generally, as I told the judge, it is either late adolescence or early childhood, you know. It is age 17 to 24. That is the usual time. Of course, there are outliers. Somebody could have it earlier and somebody could have it later, but generally it

14

is anything.

Q And the criteria that you mentioned, if somebody had exhibited those criteria between the ages of 18 and 22, would that change your opinion as to their diagnosis?

A Well, you know, you have a cluster. You can't just say the individual is suspicious and so they have schizophrenia. You have to have a cluster of symptomatology, and that symptomatology has to actively interfere with their functioning as well. And so, there are -- to make a definitive diagnosis you have to meet several criteria according to the DSM, you know, four or five. I guess at this time we would go to the DSM4. You know, can't just go by one of those symptoms. There has to be the whole cluster and then, it has to interfere with the individual's functioning.

R. 48–50. Dr. Khushalani agreed with Dr. Gefter that Plaintiff may have had symptoms during the relevant time period. R. 52–54. However, in response to questioning by the ALJ, Dr. Khushalani specifically disagreed with Dr. Gefter's opinion that Plaintiff's symptoms were "profound" as of 2007, characterizing that opinion as "conjecture":

Q [ALJ] And so, let me see if I can just follow-up here. And so, you were looking at 15F still and it sounds like -- and I just want to make sure I am on the same page with all of us here today. Are you disagreeing with the analysis of -- excuse me -- Dr. Geffner [sic]? Thank you. In other words, is there something in Dr. Geffner's [sic] letter that you would disagree with?

A Well, I think I disagree with his categorical statement. He is going again by conjecture like I did, that it is certainly possible. But he is saying there is no doubt in his mind that he had the symptoms for a profound level before 2007. And even if the symptoms present themselves, you don't right away have profound levels. You know? As I said, initially there may have been some symptoms at that time. I tend to disagree with the categorical symptoms and that he has no doubt that the symptoms reached to a profound level. It is conjecture.

R. 55.

Finally, asked about Plaintiff's behavior leading to the 2007 emergency department visit, Dr. Khushalani testified that he could not conclusively attribute that behavior to schizophrenia:

Q Actually, let me ask you one other thing. And so, we do have the -- you know, counsel went through the incident, or I will call it the hospital visit in 2007. It is at Exhibit 12F. Counsel had identified some observations that were made, for

15

example, bizarre behavior. . . . So he – you know, counsel identified for example bizarre behavior and then, also some other things. I think on page 22 there was a description of what -- you know, essentially why Mr. M[.] was in the ER that day and then it also mentioned that he had depressed mood; his affect was constricted. And let me ask you this. I mean, one of the things. Well, is this a -- in your opinion, an isolated incident? Is it indicative of where Mr. M[.] was headed, meaning in terms of his current condition. I am just trying to understand where these hospital visits fit in kind of the bigger picture.

A Well, they conclusively say -- you know, again, he is an adolescent and so some of those areas could have been explained by his age and so, any of those are possible but there is no conclusive evidence that we can put -- pin it on one particular diagnosis or incident. You know, this could be just the young youngster acting out or I think there may have been some alcohol involved.

Q Yeah.

A And so, conclusively I cannot say it because it is either schizophrenia or it is not.

Q Well, just let me confirm one thing with you. When you say adolescent, he was 22 at the time. Is that -- I just want to make sure we are on the same page as to his age?

A I meant adolescent, early adult.

Q Okay.

A You know, that is -- you know --

Q Okay.

A It is part of the range. Yes.

Q Fair enough. And I agree with you. I do read. Well, in terms of there is a reference here to ingesting alcohol, driving to his church wearing underwear. And so, is it fair to say that it is unclear whether this was schizophrenia, alcohol induced, a combination of both alcohol and schizophrenia or a schizoaffective disorder? Is that a fair or an unfair statement?

A I think it is more than fair. I would even say that it is not conclusive that he was exhibiting schizophrenic symptoms. I would say at this point it was alcohol abuse.

R. 58–59.

16

## V.    DISCUSSION

Plaintiff raises a single issue: whether the ALJ violated his duty to develop the record when he failed to enforce a subpoena for records. *Brief*, ECF No. 10; *Plaintiff's Reply Brief*, ECF No. 13. For the reasons that follow, the Court concludes that remand is not warranted on this basis.

"ALJs have a duty to develop a full and fair record in social security cases." *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (citations omitted). The ALJ "will make *every reasonable effort* to help [a claimant] get medical evidence from [the claimant's] own medical sources and entities that maintain [the claimant's] medical sources' evidence when" given permission by the claimant "to request the reports." 20 C.F.R. § 404.1512(b)(1) (emphasis added); *see also id*. at § 404.1512(b)(1)(i) (explaining that "[e]very reasonable effort means that we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence, and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination"). "That requirement [of the ALJ to develop the record] is most critical in situations in which social security claimants are not represented by counsel and thus may not be capable of putting the best face on their claims, but it is equally applicable where lawyers are handling the case[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005). However, when a claimant is represented by counsel at the administrative stage, "the ALJ is entitled to assume that the claimant is making the strongest case possible for benefits." *Myers v. Berryhill*, 373 F. Supp. 3d 528, 539 (M.D. Pa. 2019) (citations omitted); *see also Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) ("The

17

claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five.").

Relevant to this action, "[w]hen it is reasonably necessary for the full presentation of a case, an [ALJ] . . . *may*, on his or her own initiative or at the request of a party, issue subpoenas . . . for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing." 20 C.F.R. § 404.950(d)(1) (emphasis added); *see also Torres v. Barnhart*, 139 F. App'x 411, 414 (3d Cir. 2005) (citing this regulation and noting the ALJ's discretion in whether to issue a subpoena). Similarly, the Social Security Administration's Hearings, Appeals, and Litigation Law Manual ("HALLEX") provides that "[w]hen it is reasonably necessary for the full presentation of a case, an administrative law judge (ALJ) *may* issue a subpoena on the ALJ's own initiative or at the request of a claimant or appointed representative." HALLEX I-2-5-78,[7] *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/2501250078 (last visited Apr. 16, 2026) (emphasis added). HALLEX further provides that "[i]f an individual refuses or fails to comply with a subpoena, the [ALJ] . . . will consider any change in circumstance since issuing the subpoena and re-evaluate whether the evidence or facts requested are reasonably necessary for the full presentation of the case." HALLEX I-2-5-82, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/2501250082 (last visited Apr. 16, 2026). "If the ALJ finds the information is *reasonably necessary* for the full presentation of the case, he or she will

---

[7] The Social Security Administration ("SSA") recently renumbered all sections of HALLEX in order "[t]o consolidate and standardize our instructions systems." *See* https://www.ssa.gov/OP_Home/hallex/hallex.html (last visited Apr. 16, 2026). For ease of reference, however, the Court will use the HALLEX citations referred to in the parties' briefing, *i.e.*, HALLEX I-2-5-78, instead of the new citation HA 01250.078.

prepare a memorandum to the Office of the General Counsel (OGC) Regional Chief Counsel, requesting enforcement of the subpoena." *Id*. (emphasis added).

In the present case, by way of background, Plaintiff's mother testified at the administrative hearing that, in connection with a custody matter relating to Plaintiff's child, Plaintiff underwent a psychiatric or psychological evaluation in 2005 or 2006 ("Florida records"). R. 79. In his written decision, the ALJ explained in detail the efforts made by Plaintiff's family, by Plaintiff's counsel, and the by ALJ himself to obtain those Florida records:

> Pursuant to the requirements under 20 CFR 404.935(a), the claimant's representative submitted letters dated March 16, 2023 and June 9, 2023 wherein he requested that the record be kept open to allow an opportunity to obtain and submit additional medical records from Igor Gefter, M.D. (21E; 27E). However, at the outset of the hearing, the claimant's representative indicated that the record was "complete," and he was not expecting to submit any additional records. During the testimony of [ ] Plaintiff's mother, she noted that the claimant underwent a psychiatric and/or psychological evaluations in connection with a family court matter in the state of Florida or the custody of his daughter, who is now eighteen years of age. Accordingly, the undersigned kept the record open for thirty days to allow the representative an opportunity to submit and obtain these records if they exist.

> Subsequently, in a July 14, 2023 letter, the claimant's representative reported on his efforts to obtain these records including writing to the clerk for Hillsborough County in Florida to obtain psychological records, which date from the relevant time period based on his "information and belief" (30E). At that time, he noted that the clerk informed him that "only a party to the case can have access to it and that person would have to go in person to the Clerk's office and produce ID and purchase the documents" (Id.). At that time, he requested that the undersigned issue a subpoena for these documents (Id.).

> On July 17, 2023, the undersigned issued an Assistance Request with the local DDS office to request these records from the clerk in Hillsborough Florida, which issued a medical records request for these records (31E). In an August 9, 2023 letter, the claimant's representative acknowledged that the ALJ issued the "subpoena," but he noted that the claimant's mother, as a party to the custody matter, would attempt to get the records, and he asked for a three-week extension "so she can travel to Florida" to do so (33E). The DDS office attempted to follow up with the request for records on July 31, 2023 (18F). The undersigned sought an update with the DDS for a status update on this DDS request on August 4, 2023 (31E). On August 21,

19

2023, the DDS closed the Assistance Request after being unsuccessful in its attempt to get these records (18F).

In an August 28, 2023 telephone call to the representative, he indicated that the claimant's mother and daughter would go to the Bergen County Clerk's Office in New Jersey, due to their belief that the records would be there, "as the child custody case came from Bergen County" (34E/1). In an August 28, 2023 letter, the representative requested a two-week extension so that he, along with the claimant's mother, could go to the Bergen County courthouse to secure a copy of these records (35E).

R. 14–15. The ALJ explained that he had issued a subpoena for the Florida records at the request

of Plaintiff's counsel and had followed up—to no avail—on that request:

In a September 8, 2023 letter, the claimant's representative requested that the undersigned issue a subpoena to the Hillsborough County clerk, as he was informed that the Bergen County Superior Family Division did not have the records (36E). On September 11, 2023, the undersigned's assistant made various phone calls including to the Hillsborough County clerk in Tampa Florida, the Thirteenth Judicial Circuit Court George Edgecomb Courthouse, the Juvenile Dependency Unit, and the Florida OHO on recommendations for the entity and address for the issuance of the subpoena (37E).

On September 14, 2023, the undersigned issued the subpoena, which was addressed to the Hillsborough County Clerk: Family Court, with notations that all records relevant to the claim "In the Interest of Jocelyn M[.]" be provided within twenty calendar days (26B). This subpoena was delivered with United Parcel Service ("UPS") confirmation dated September 18, 2023 (39E). Subsequent attempts to follow up with this request on October 10, 2023 by telephone were unsuccessful (40E).

R. 15. The ALJ denied the subsequent request by Plaintiff's counsel to formally enforce the

subpoena, explaining that the Florida records were not reasonably necessary for the full

presentation of the case:

In an October 18, 2023 letter, the claimant's representative requested that the undersigned forward this subpoena to the Office of General Counsel ("OGC") for further prosecution of the subpoena (41E).

The undersigned denies this request to forward the subpoena to the OGC for further enforcement of the subpoena. Specifically, HALLEX I-2-5-78(B) notes that the factors used for issuance of a subpoena are (a) claimant and/or ALJ cannot obtain the information or testimony without the subpoena; and (b) the evidence or

testimony is reasonably necessary for the full presentation of the case. Further, HALLEX I-2-5-82 notes that the ALJ shall re-evaluate whether the evidence of facts requested are reasonably necessary for the full presentation of that case.

In evaluating the relevant factor, the undersigned finds that any one-time psychiatric evaluation in connection with the custody matter of the claimant's daughter is not reasonably necessary for the full presentation of the case. First, it is not certain that the Hillsborough County clerk has any relevant evidence to the period from November 1, 2005 through August 19, 2007. Specifically, although the claimant attained age 18 on August 19, 2003, the earnings query reports show earnings at the substantial gainful activity level in 2005, with earnings of $27,291.68 (4D; 13D). In the Adult Disability report, he noted that he stopped working on November 1, 2005, due to his conditions (2E/2). Moreover, the evidence of record notes an October 19, 2006 referral form for a psychological evaluation in relation to his custody case to Care Plus NJ, Incorporated, Outpatient Mental Health Services (19F/1), with a concurrent October 19, 2006 referral to a parenting class (19F/2).

More importantly, 20 CFR 404.1509 requires that an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months" at a "severe" level, which is otherwise known as the durational requirement. The undersigned notes that a single one-time examination, whether it occurred in 2005 or 2006, would not change the analysis in the absence of any other longitudinal objective medical evidence either within the same relevant timeframe, or occurring very shortly after this period. Specifically, the evidence of record shows no consistent treatment, whether on an inpatient or outpatient basis, until well after an inpatient hospitalization from April 29, 2009 to May 12, 2009 (3F; 10F). The first indications of consistent outpatient treatment started on November 27, 2010, when he saw psychiatrist Sous Manal, M.D. (4F/1). Further, although psychiatrist Igor Gefter, M.D., noted in various letters of treating the claimant since April 2009 (11F/1-2; 13F/3; 16F/1-2), February 17, 2014 (15F/1-2), and February 5, 2016 (3F/7; 13F/2; 16F/3-4) with documentation that Dr. Gefter evaluated the claimant during the April 29 to March 12, 2009 hospitalization, the earliest documented outpatient visit with Dr. Gefter is March 4, 2016 (6F/3-4). Similarly, although he did have an emergency department visit on June 6, 2007, which is just prior to the end of the relevant period, the examination at that time generally showed logical, lucid, and coherent thought process, along with no bizarre delusions and denials of perceptual distortions (12F).

Further, his alleged activities during this relevant period, whether based upon his own self-report or other references in the record, also would be inconsistent with any one-time examination in relation to the psychological evaluation connected to the custody matter involving his daughter. In particular, he has testified to attending in-person classes at Pace University in Brooklyn after he graduated high school in 2003, with him commuting from his home in Park Slope Brooklyn to classes by driving. He stated that he attended Pace University from 2003 to 2005. Thereafter,

21

he noted that he went to American Intercontinental University, and finally Fairleigh Dickinson University, where he finally obtained a Bachelor of Arts degree in 2012. He reported that he attended university "consecutively" without any breaks. Notably, when he presented to the emergency department at Hackensack University Medical Center on June 5, 2007, he reported that he was in his second year at Fairleigh Dickinson University while majoring in marketing (12F).

Based on the foregoing, the undersigned finds that a single one-time psychological and/or psychiatric evaluation in connection with his custody matter in relation to his daughter is not reasonably necessary for the full presentation of the case. Accordingly, the undersigned denies the representative's request for the undersigned to forward the subpoena to the OGC for further enforcement.

R. 15–17.

The ALJ proceeded through the sequential evaluation, finding at step two that Plaintiff had the medically determinable impairment of psychosis NOS, but that the impairment was not severe because it did not meet the durational requirement, *i.e.*, an impairment lasting at a "severe" level for a continuous period of at least 12 months. R. 19–28. In detailing the evidence, the ALJ noted, *inter alia*, the lack of consistent treatment and gaps in treatment. R. 22–25. The ALJ specifically found as follows:

As discussed in detail above, the only documented treatment during the period at issue is the June 5, 2007 emergency department visit for "bizarre behavior" (12F). As noted in detail above, the mental status examination, while being remarkable for evasive and guarded attitude, poor insight, some circumstantial thought process, and paranoia regarding his health, was unremarkable for orientation, grooming, and the lack of any suicidal ideation, homicidal ideation, delusions, or clear hallucinations (12F/23-24, 36-37). At that time, he received a diagnosis of psychosis NOS, and the hospital psychiatrist concluded that he did not meet the criteria of involuntary psychiatric admission, as he was "in no immediate danger to self or others," with a recommendation to follow up on an outpatient basis (12F/37). As noted above, there is no documentation of any consistent outpatient treatment until November 27, 2010, when he saw psychiatrist Dr. Sous who diagnosed bipolar disorder at that time (4F/1). Further, the next significant documentation of treatment is the April 2009 to May 2009 hospitalization, which is well after the period at issue. Accordingly, there is no objective evidence during the period at issue that his symptomatology from his mental medically determinable impairments lasted at a "severe" level for a continuous period of at least twelve months. For purposes of the "paragraph B" criteria, this means that there is no objective evidence for a

22

continuous period that his mental medically determinable impairments caused more than mild limitations in these domains.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1)).

R. 25. In making this determination, the ALJ evaluated the opinions of Dr. Gefter, Plaintiff's treating psychiatrist, and of Dr. Khushalani, the medical expert. R. 25–28. The ALJ found Dr. Gefter's opinions to be unpersuasive because they were inconsistent with other objective record evidence:

Turning to the opinion evidence, Dr. Gefter provided numerous opinions (3F/3, 7; 11F/1-2; 13F/1, 2, 3; 15F/1-2; 16F/1-2, 3-4, 4).

In a February 10, 2016 letter, Dr. Gefter noted that the claimant was "suffering from schizophrenic disorder, residual type, chronic" and he had "practically no chance that this patient can participate in any kind of jury duty" (3F/8; 13F/1; 16F/4).

In an April 18, 2016 letter, Dr. Gefter noted that he has been treating the claimant since February 5, 2016 with varying diagnoses of residual schizophrenia, schizoaffective disorder bipolar type, and chronic delusional disorder (3F/7; 13F/2; 16F/3-4). Dr. Gefter noted that the claimant was "absolutely incapacitated and unable to work," would "never [be] able to maintain any job," and was "unable to recognize his symptoms, does not acknowledge presence of illness" (Id.). Lastly, he noted that the claimant was "suffering from chronic, intractable delusions of grandeur," experience auditory hallucinations, and "engaging in absolutely useless, futile activity" (Id.).

In a June 19, 2021 letter, Dr. Gefter indicated that he has treated the claimant since April 2009 when he was seen at the Ramapo Ridge Psychiatric Hospital in the context of acute psychosis, delusions, and paranoia (11F/1-2; 13F/3; 16F/1-2). Further, he indicated that he started treating the claimant at several locations after he "inherited" the claimant as a patient from Manal Sous, M.D., who "previously treated him for "number of years." Dr. Gefter noted that his symptoms "started and possibly was somewhat precipitated or became more apparent around December 2005," after a car accident where he suffered a right hip fracture and was concurrently diagnosed with "depression" (11F/2; 16F/2). Further, he noted that the claimant's history of "severe illness goes back to time of being 21 years old" when he developed disorganized behavior, bizarre paranoid thoughts, and "intense issues with his cognitive functioning" (11F/1; 13F/3; 16F/1). Further, he noted that "since I have known him," he has "shown signs of disconnection from objective reality of

23

surrounding world; living and continuously existed in own universe of grandiose delusions, where he is a successful, omnipotent human with superb abilities" (Id.). Dr. Gefter noted that "his condition and behavior has deteriorated" (Id.).

In a February 22, 2023 letter, Dr. Gefter noted that he has been treating the claimant since February 17, 2014 for diagnoses of residual schizophrenia and major depressive disorder, recurrent, severe with psychotic features (15F/1-2). Dr. Gefter noted that the claimant's symptoms started around December 2005 corresponding to a car accident and "the first engagement with his psychiatrist/previous provider happen" (15F/1). He concluded, "There is absolutely no doubt that his symptoms reached profound levels way before 2007 and that was quite clear to more than a reasonable degree of medical certainty at the time" (Id.). He noted that he "still refused treatment and his treatment was very sporadic," and he based his opinion on "my multiple conversation with patient's parents, historical facts about schizophrenia also correspond to the age of onset of illness for this gentleman, my examination of patient's, which are in numerous as well as my training and work on acute psychiatric facilities for at least 38 years old point to that conclusion" (Id.). Further, he noted, "I am certain, absolutely and fully convinced to a reasonable degree of medical certainty that the onset of illness prevented this young man from ever being able to be productive member of society, works for wages and survive without help of others who are currently available but will not be available forever in his future life" (15F/2). Further, he noted that "it is absolutely no doubts more than a reasonable degree of medical certain that he has been disabled from childhood" (15F/2).

The undersigned finds that Dr. Gefter's opinions are not persuasive. Although Dr. Gefter provided a basis for his opinion and has a treating relationship with the claimant, the treatment relationship insofar as consistent outpatient treatment did not begin until March 4, 2016 (6F/3). Dr. Gefter did evaluate and treat the claimant during the April 2009 to May 2009 hospitalization at Ramapo Ridge Psychiatric Hospital, but it is notable that the only emergency department visit during the period at issue occurring in June 2007 resulted in a finding that the claimant did not meet the criteria for involuntary psychiatric hospitalization, with the mental status examination showing no delusions or hallucinations. Therefore, the opinion is inconsistent with the objective evidence for the period at issue, as there is no documentation of any consistent psychiatric treatment during the period at issue, along with no significant treatment until well after the period at issue. Further, although Dr. Gefter treated the claimant during the April 2009 to May 2009 hospitalization, the discharge summary contains a Global Assessment of Functioning ("GAF") score of 20 on admission with a highest estimated GAF score of 65 with the last year, indicating "mild symptoms." Although the current edition of the Diagnostic and Statistical Manual of Mental Disorder ("DSM") does not utilize GAF scores, the DSM-IV was utilized at the time of this admission, and although not definitive on its own, Dr. Gefter's assessment of a highest GAF score within a year prior to the April 2009 admission in the "mild" symptoms range, is inconsistent with his opinion contained within these numerous letters. Moreover,

in terms of Dr. Gefter's opinion that the claimant has "been disabled from childhood," this is inconsistent with the claimant's ability to engage in substantial gainful activity through November 1, 2005. 20 CFR 404.1520(a)(4)(i) provides, "If you are doing substantial gainful activity, we will find you are not disabled." Lastly, the undersigned notes that Dr. Gefter's opinion is not a function-by-function analysis or stated in terms utilized by the regulations and the relevant listing, such as the "paragraph B" criteria. For all these reasons, the undersigned finds at Dr. Gefter's opinions are not persuasive for the period at issue.

R. 25–27. The ALJ went on to explain why he found Dr. Khushalani's opinion partially

persuasive:

At the hearing, Ashok I. Khushalani, M.D., an impartial medical expert, testified that he did not see any records during the period at issue to establish a mental medically determinable impairment. However, upon questioning by the claimant's representative, he reviewed the June 2007 emergency department visit. However, after this review, Dr. Khushalani noted that there was still insufficient evidence for the period at issue. Specifically, he identified that evidence he would utilize to evaluate schizophrenia including primarily paranoid ideation, delusions, or auditory/visual hallucinations, along with mood fluctuations, suicidal ideation, neglect of personal hygiene and personal relationships, which he described as "the hallmarks of schizophrenia." Dr. Khushalani noted that there must be a "cluster of symptomatology and that cluster must interfere with functioning as well." Further, although he noted that the general onset of schizophrenia for males would be late adolescence to early adulthood, there could be outliers where they could exhibit symptomatology of schizophrenia earlier or later than those periods. In determining onset, he would also consider his examinations of a particular patient and interviews or statements made by family members. However, when asked about Dr. Gefter's written statement particularly that it was clear to reasonable degree of medical certainty the claimant's schizophrenia was at a "profound level" prior to age 22, Dr. Khushalani noted that it was speculative given the lack of any corresponding objective evidence for the period at issue.

The undersigned finds that Dr. Khuslani's opinion is partially persuasive. In terms of his testimony that there were no mental health treatment records during the period at issue, this is inconsistent with the overall evidence of record. Although it is true that the record contains minimal mental health treatment documentation, it does contain the June 2007 emergency department visit that contains an evaluation by a hospital psychiatrist. However, his testimony indicating that there was essentially no consistent treatment until well after the period at issue is consistent with the overall evidence of record, which shows only the June 2007 emergency department visit, an April 2008 hospital visit, an April 2009 to May 2009 inpatient hospitalization, and no consistent outpatient treatment until November 2010 when he saw Dr. Sous for an outpatient psychiatric evaluation.

R. 27–28. The ALJ therefore concluded that the ALJ had not been under a disability, as defined by the Social Security Act, at any time prior to August 19, 2007, the date Plaintiff attained the age of 22. R. 28.

In his challenge, Plaintiff argues that the ALJ should have forwarded the subpoena to the OGC for enforcement because there was scant other evidence available. *Plaintiff's Brief*, ECF No. 10, p. 11; *Plaintiff's Reply Brief*, ECF No. 13, pp. 4–5. According to Plaintiff , the ALJ improperly downplayed the significance of the Florida records by speculating that those records consisted of only a one-time evaluation. *Plaintiff's Brief*, ECF No. 10, p. 11. Plaintiff characterizes the Florida records as relevant because they "would inform the ALJ's consideration of the medical opinion evidence." *Id*. at 12; *see also Plaintiff's Reply Brief*, ECF No. 13, p. 2. Plaintiff points to Dr. Khushalani's testimony that there was insufficient evidence during the relevant time period and that the general onset of schizophrenia for males is late adolescence to early adulthood, which is when the Florida records were generated. *Plaintiff's Brief*, ECF No. 10, p. 10. Plaintiff also argues that the Florida records would address the medical expert's discounting of Dr. Gefter's opinions on the ground that those opinions lacked supporting evidence. *Id*. at 12–14. "[I]t is impossible to believe that Dr. Gefter, as a treating source" would not find the Florida records, "one-time or not, highly relevant for understanding and treating Plaintiff." *Id*. at 14. Plaintiff also suggests that the ALJ's own actions, *i.e.*, his efforts to obtain the Florida records, belie his later conclusion that such records were not reasonably necessary. *Id*. at 15. With so little evidence in the record, Plaintiff argues, the ALJ's refusal to enforce the subpoena prejudiced him. *Id*. at 15–16 (citing *Serrano v. Kijakazi*, No. CV 20-3985, 2021WL 4477137 (E.D. Pa. Sep. 30, 2021)).

Plaintiff's arguments are not well taken. "Although an ALJ has broad discretion to decide whether to issue a subpoena, the Third Circuit does not appear to have specifically addressed the question of whether an ALJ must enforce a subpoena that he or she has issued." *Serrano*, 2021 WL 4477137, at *7 (citations omitted); *see also* 20 C.F.R. § 404.950(d)(1) (providing that an ALJ "may" issue a subpoena when it is reasonably necessary for the full presentation of the case); HALLEX I-2-5-78 (same). As noted above, HALLEX instructs that, when faced with non-compliance with a subpoena, the ALJ "will consider any change in circumstance since issuing the subpoena and re-evaluate whether the evidence or facts requested are reasonably necessary for the full presentation of the case." HALLEX I-2-5-82; *see also Serrano*, 2021 WL 4477137, at *8 ("Courts in this district have held that, although an ALJ may not be required to enforce a subpoena he or she has issued, an ALJ 'should at least articulate his [or her] reasoning for declining' to do so.") (citations omitted). However, the Court of Appeals for the Third Circuit has previously recognized that HALLEX, as an internal manual, lacks the force of law and does not create any judicially-enforceable rights. *See Moraes v. Comm'r Soc. Sec.*, 645 F. App'x 182, 186 (3d Cir. 2016) ("[A]s an internal manual, HALLEX does not have the force of law[.]") (citations omitted); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007) (stating that HALLEX "lack[s] the force of law and create[s] no judicially-enforceable rights") (citations omitted).

In this case, as set forth above, the ALJ took multiple steps to secure the Florida records, including sending an Assistance Request with the local DDS Florida office to request the records; issuing a subpoena; and following up when there was no response to that subpoena. R. 15. The ALJ also explained at length why, upon re-evaluation of the evidence, he believed that the Florida records were not reasonably necessary for the full presentation of the case. R. 16–17.

27

For example, he explained that it was not certain that the Florida clerk had any evidence relevant to the time period. R. 16. Even if there was a one-time mental evaluation in 2005 or 2006, the ALJ pointed out that such evaluation did not assist with the durational requirement and would not change the analysis in the absence of other longitudinal objective medical evidence during the relevant period. *Id*. Moreover, the ALJ concluded that Plaintiff's other activities during the relevant period—*i.e.*, work-related earnings at the substantial gainful activity level in 2005 and attending in-person university classes—would be inconsistent with evidence (even assuming that such evidence existed) in a one-time evaluation of a disability meeting the duration requirement of the statute. *Id*. Based on this record, it is clear to this Court that the ALJ took every reasonable effort to secure the evidence that Plaintiff requested and explained—re-evaluated—why that evidence was not reasonably necessary to the full presentation of the case. Under these circumstances, Plaintiff has not shown that remand is warranted. *See* HALLEX I-2-5-82; 20 C.F.R. § 404.1512(b)(1); *see also Joseph v. Comm'r of Soc. Sec. Admin*., No. 23-CV-4562(EK), 2025 WL 1504045, at *4 (E.D.N.Y. May 27, 2025) ("Clearly, the ALJ did not abdicate his duty to develop the administrative record" under the "every reasonable effort" obligation under § 416.912(b) when that ALJ sent initial evidentiary requests; followed up those requests; subsequently issued a subpoena; and called to inquire about the status of the subpoena); *Michael D. v. Comm'r of Soc. Sec*., No. 3:22-CV-104 (CFH), 2023 WL 3601718, at *5 (N.D.N.Y. May 23, 2023) ("The SSA and the ALJ made extensive efforts between 2016 and 2021 to obtain treatment records from Dr. Babiak that easily surpass the 'reasonable' threshold. . . . The ALJ cannot be faulted for Dr. Babiak's apparent refusal to produce the records that were repeatedly requested. . . . As the ALJ made every reasonable effort to obtain the missing treatment notes and

complete the record, it cannot be said that he failed to develop the record. Thus, remand is not warranted on this ground.").

To the extent that Plaintiff argues that the ALJ's own efforts to obtain the Florida records undermine the ALJ's ultimate finding that such records were not reasonably necessary and therefore provide a basis for remand, this Court disagrees. It is true that ALJs have an obligation to develop the record. *Ventura*, 55 F.3d at 902; 20 C.F.R. § 404.1512(b)(1). As the ALJ in this case expressly noted, however, once he undertook efforts to obtain the Florida records, HALLEX directed him to re-evaluate whether that evidence was reasonably necessary for the full presentation of that case. *Id*. at 16 (citing HALLEX I-2-5-82). The ALJ did precisely that, even though he was under no obligation to follow HALLEX. *See Serrano,* 2021 WL 4477137, at *8 ("Here, the ALJ was not required to enforce the subpoena for the records . . . since the relevant case law recognizes no judicially enforceable duty to follow HALLEX. . . . Serrano has failed to make out a legally cognizable claim that the ALJ erred in failing to enforce the subpoena.") (citing HALLEX I-2-5-82).

## VI.    CONCLUSION

Accordingly, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  April 17, 2026                          *s/Norah McCann King*
                                               NORAH McCANN KING
                                               UNITED STATES MAGISTRATE JUDGE


29